# Exhibit A

```
                                            Page 1
 1   Volume I                          Pages 1 - 177
 2                                    Exhibits 10 - 52
 3           IN THE UNITED STATES DISTRICT COURT
 4            FOR THE DISTRICT OF NEW HAMPSHIRE
 5                              Case No. 1:12-cv-00127
 6   ************************************************
 7   JEFFREY BRADLEY,
 8        Plaintiff,
 9   VS.
10   WELLS FARGO BANK, N.A., TRUSTEE POOLING AND
11   SERVICING AGREEMENT DATED AS OF OCTOBER 1, 2004
12   ASSET-BACKED PASS-THROUGH CERTIFICATES SERIES
13   2004-MHQ1, ET AL.,
14        Defendants.
15   ************************************************
16          DEPOSITION of ERIC G. MART, Ph.D., ABPP
17          Wednesday, August 5, 2015 at 10:00 a.m.
18                      Regus Business
19               170 Commerce Way, Suite 200
20              Portsmouth, New Hampshire 03801
21          ------ Jacqueline P. Travis, RPR, CSR ------
22
23
24
25
```

Page 2

1  APPEARANCES:
2
3  Representing the Plaintiff:
        UNION LAW OFFICES PC
4        BY:  RUTH HALL, Esquire
        112 Main Street
5        Union, New Hampshire 03887
        603-473-2222
6        lawyerlady@yahoo.com
7
   Representing the Defendants:
8     DUANE MORRIS LLP
        BY:  ALEXANDER BONO, Esquire
9            ELIZABETH LaCOMBE, Esquire
        30 South 17th Street
10       Philadelphia, Pennsylvania 19103-4196
        215-979-1181 ~ FAX: 215-689-4472
11       abono@duanemorris.com
        elacombe@duanemorris.com
12
13 ALSO PRESENT:
14       Elana Brander, summer intern
15
16
17
18
19
20
21
22
23
24
25

Page 3

```
 1                       I N D E X
 2
 3    Testimony of:                        Page(s)
 4    ERIC G. MART, Ph.D., ABPP
 5    By Mr. Bono                             7
 6
                        E X H I B I T S
 7
 8    Exhibit No.        Description       For I.D.
 9    Exhibit  10  Invoice dated August 5, 2015    19
10    Exhibit  11  Agreement dated January 12,
                   2015                            21
11
      Exhibit  12  Curriculum Vitae of Eric G.
12                 Mart, Ph.D., ABPP              23
13    Exhibit  13  Copy of shipping label dated
                   February 11, 2015              23
14
      Exhibit  14  Trauma Symptom Inventory-2
15                 Score Report dated January 12,
                   2015                            23
16
      Exhibit  15  Clinical Interview/History     25
17
      Exhibit  16  Letter dated January 14, 2015  26
18
      Exhibit  17  Personality Assessment
19                 Inventory Score Report dated
                   January 12, 2015               26
20
      Exhibit  18  Handwritten notes              27
21
      Exhibit  20  Confidential Psychological
22                 Report dated January 22, 2015  29
23    Exhibit  20  Welcome Page of Eric G.  Mart,
                   Ph.D., ABPP Board Certified
24                 Forensic Psychologist          39
25
```

Page 4

```
 1   Exhibit  21   Practice Areas Web Page of
                   Eric G. Mart, Ph.D., ABPP
 2                 Board Certified Forensic
                   Psychologist                   44
 3
     Exhibit  22   Article entitled
 4                 Psychotherapist's Testimony
                   and Personal Injury Cases:
 5                 Coping With the Stealth
                   Evaluation                     50
 6
     Exhibit  23   Ethical Principles of
 7                 Psychologists and Code of
                   Conduct                         64
 8
     Exhibit  24   Dr. Mart's LinkedIn page        65
 9
     Exhibit  25   List of Court Appearances and
10                 Depositions dated January 1,
                   2005 to April 15, 2014 for
11                 Dr. Mart                        70
12   Exhibit  26   Medical Records Certification
                   Form dated February 3, 2015    101
13
     Exhibit  27   Mental Health
14                 Assessment/Consultation/Er/
                   Inpatient Admission Form dated
15                 October 8, 2001                 103
16   Exhibit  28   Seacoast Mental Health Center
                   note dated November 8, 2001    105
17
     Exhibit  29   Seacoast Mental Health Center
18                 Medication Sheet               112
19   Exhibit  30   Seacoast Mental Health Center
                   Emergency Services Contact
20                 Sheet                          114
21   Exhibit  31   Seacoast Mental Health Medical
                   Treatment Plan                 114
22
     Exhibit  32   Seacoast Mental Health Center
23                 Medical Treatment Plan Update
                   Form                           115
24
25
```

Page 5

```
 1    Exhibit  33   Seacoast Medical Health Center
                    med check evaluation dated
 2                  August 30, 2002                    115
 3    Exhibit  34   Seacoast Medical Health Center
                    med check evaluation dated
 4                  November 29, 2001                  117
 5    Exhibit  35   Seacoast Mental Health Center
                    med check eval dated July 26,
 6                  2002                               118
 7    Exhibit  36   Seacoast Mental Health Center
                    med check eval dated October
 8                  11, 2002                           120
 9    Exhibit  37   Letter dated November 13, 2002     122
10    Exhibit  38   Health Screening Form dated
                    March 3, 2006                      123
11
      Exhibit  39   Lamprey Health Care - Raymond
12                  medical note dated January 27,
                    2006                               124
13
      Exhibit  40   Lamprey Health Care - Raymond
14                  medical note dated February 8,
                    2006                               127
15
      Exhibit  41   Lamprey Health Care - Raymond
16                  medical note dated March 8,
                    2006                               130
17
      Exhibit  42   Lamprey Health Care - Raymond
18                  medical note dated August 10,
                    2006                               131
19
      Exhibit  43   Lamprey Health Care - Raymond
20                  medical note dated December
                    26, 2006                           132
21
      Exhibit  44   Lamprey Health Care - Raymond
22                  medical note dated January 30,
                    2009                               135
23
      Exhibit  45   Lamprey Health Care - Raymond
24                  medical note dated March 18,
                    2009                               138
25
```

```
                                                    Page 6

 1   Exhibit  46   Lamprey Health Care - Raymond
                   medical note dated February 4,
 2                 2011                               141
 3   Exhibit  47   Lamprey Health Care - Raymond
                   medical note dated February
 4                 25, 2011                           144
 5   Exhibit  48   Lamprey Health Care - Raymond
                   medical note dated June 10,
 6                 2011                               145
 7   Exhibit  49   Lamprey Health Care - Raymond
                   medical note dated October 7,
 8                 2011                               150
 9   Exhibit  50   Lamprey Health Care - Raymond
                   medical note dated February
10                 23, 2012                           154
11   Exhibit  51   Lamprey Health Care - Raymond
                   medical note dated January 11,
12                 2013                               157
13   Exhibit  52   Initial Psychiatric Evaluation
                   dated March 3, 2006               159
14
15        EXHIBITS APPENDED TO ORIGINAL TRANSCRIPT
16
17    ** ORIGINAL EXHIBITS 10 - 19 RETAINED IN DR. MART'S
18   CUSTODY
19    ** COPY OF EXHIBIT 12 NOT INCLUDED IN APPENDED
20   EXHIBITS
21
22
23
24
25
```

Page 7

1                    P-R-O-C-E-E-D-I-N-G-S

2              ERIC G. MART, Ph.D., ABPP, having been duly

3      sworn by the Notary Public, was examined and

4      testified as follows:

5                         DIRECT EXAMINATION

6      BY MR. BONO:

7          Q.  Good morning, Dr. Mart.

8          A.  Good morning.

9          Q.  My name is Alexander Bono.  My colleague,

10     Beth LaCombe and I are representing two of the

11     defendants in this lawsuit, Ocwen and Wells Trust.

12     I will just refer to them as Ocwen and Wells or the

13     trust for convenience, if that's okay?

14         A.  That's fine.

15         Q.  There are two other defendants that I don't

16     represent.  I'm going to ask you some questions this

17     morning.  If there is anything that's unclear, just

18     let me know and I will try to do a better job.

19         A.  Okay.

20         Q.  Dr. Mart, please give us your full name.

21         A.  My name is Eric Gallon Mart.  And that's

22     M-A-R-T.

23         Q.  And Dr. Mart, what is your date of birth?

24         A.  It's November 4th, 1955.

25         Q.  Dr. Mart, could you please tell us very

1      Q.   Now, just I want to direct your attention

2   to the bottom of page 2 and top of page 3 of the

3   publication that we've marked as D-22, and you're

4   talking about Section 7.02(a) and the strategies

5   that are helpful, and at the bottom of that

6   paragraph you talk about "This means that treating

7   therapists who testify that their clients had been

8   traumatized by a defendant's alleged actions or

9   negligence may actually be acting unethically if

10   they have not made efforts to corroborate the story,

11   substantiate the existence of the symptoms, or rule

12   out symptom exaggeration, malingering or false

13   imputation."

14      A.   Yes.

15      Q.   What do you mean by that?

16      A.   Well, this comes up quite a bit.  There

17   will be a divorce going on and parent A will take a

18   child to a therapist.  Parent A will tell the

19   therapist their version of the events.  And the

20   therapist, having spoken only to that parent and to

21   the child will go into court and say this child has

22   definitely been abused by parent B.  Parent B should

23   have no contact outside of supervision, and provides

24   those types of opinions.

25      Q.   What type of techniques are used for

Page 59

1    corroborating the story?

2        A.   When possible, you try to see if there is

3    information in the record or from other individuals

4    that supports or don't support the individual's

5    version of the events.

6        Q.   Deposition testimony?

7        A.   That could be helpful.

8        Q.   Have you read deposition testimony in

9    connection with your report regarding Jeffrey

10   Bradley?

11       A.   I have not.

12       Q.   Would it be fair to say that the deposition

13   of others in this case might corroborate whether his

14   story is accurate or not?

15       A.   It could.

16       Q.   "Substantiating the existence of symptoms,"

17   is that different than corroboration?

18       A.   Well, it would be a little different

19   because, I mean, although they're related concepts,

20   it would be somebody tells you they're terribly

21   depressed, you do some testing and clinical

22   assessment to determine whether they actually appear

23   to be depressed.

24       Q.   So it would be some kind of empirical test?

25       A.   Empirical testing isn't the end-all,

Page 89

1        A.   Attorney Harman called me up, said I have a
2    case of a gentleman whose house was, we think,
3    wrongly repossessed and his personal possessions,
4    many of them were destroyed.  And we would like an
5    assessment to see how, if his mental state was
6    affected by that.
7        Q.   And according to Exhibit D-10 through D-19,
8    which were the sum and substance of your file on
9    Mr. Bradley, there's no indication of that referral,
10   correct?
11       A.   I'm not sure I understand your question.
12       Q.   Was there anything in the file that shows
13   this referral that you just described from
14   Ms. Harman?
15       A.   The record was in my file.
16       Q.   I'm talking about the original referral.
17   Did you receive a letter?
18       A.   No, she called me.
19       Q.   Did you receive a copy of the pleadings
20   that described what the lawsuit was about?
21       A.   I don't believe so.
22       Q.   Have you ever looked at the pleadings in
23   this lawsuit to determine what it's about?
24       A.   I have not looked at the pleadings.
25       Q.   So you don't know whether there's a first,

1    second or third amended complaint in this case,

2    correct?

3        A.  I do not.

4        Q.  You don't know whether the judge has thrown

5    out certain claims in this case?

6        A.  I don't.

7        Q.  And you don't know whether the loss of his

8    home is an issue in the lawsuit, do you?

9        A.  Only insofar as what the attorney

10    represented to me and he represented to me.

11        Q.  But you didn't go back and verify by

12    looking at the pleadings to see what the claims were

13    that were still outstanding, did you?

14        A.  I didn't.  And I probably wouldn't have

15    anyway, because I don't really under -- this is a

16    very complicated area of law, and I'm not sure I'd

17    follow.

18        Q.  I'm not sure I'd agree with you it's

19    complicated all.  Did you look at any photographs

20    concerning the possessions that he claimed were

21    destroyed?

22        A.  No.

23        Q.  And you already testified you looked at no

24    depositions in this case, correct?

25        A.  That's correct.

Page 102

1   medical records?

2        A.   No.

3        Q.   Fair to say you've never seen what we've

4   marked as D-26 before?

5        A.   No.

6        Q.   Is this something that you would have liked

7   to have seen in doing your assessment of

8   Mr. Bradley?

9        A.   Yes.

10        Q.   And fair to say that your assessment is

11   incomplete because you lacked the opportunity to

12   review this sort of important data?

13        A.   Yes.

14        Q.   This says that Mr. Bradley, in July of

15   2002, was hospitalized at Hampstead Hospital and

16   diagnosed with bipolar disorder and started on

17   Depakote, correct?

18        A.   Yes.

19        Q.   And what is Depakote?

20        A.   It's a mood stabilizer.

21        Q.   This also says that he was taken off Zoloft

22   and given a trial of Effexor?

23        A.   Yes.

24        Q.   Correct?  Do you have any reason to believe

25   that Dr. Tim Breitholtz would lie on a closing

```
                                        Page 103
 1   summary for a patient of his?
 2        A.  No.
 3             MR. BONO:  Let's mark D-27.
 4             (Exhibit No. 27, marked; Mental Health
 5   Assessment/Consultation/Er/Inpatient Admission Form
 6   dated October 8, 2001.)
 7        A.  Okay.
 8        Q.  Fair to say you've never seen D-27 before
 9   today?
10        A.  That's correct.
11        Q.  Is this something you would have liked to
12   have seen in doing your assessment of Mr. Bradley?
13        A.  Yes.
14        Q.  And is it fair to say that your assessment
15   is incomplete because you didn't have the
16   opportunity to review something like D-27?
17        A.  Yes.
18        Q.  And D-27 references Mr. Bradley's specific
19   episode of the loss of a long-term job in 2001, to
20   summarize, correct?
21        A.  Yes.
22        Q.  And among other things, it also says for
23   five years he had been under the care of Dr. Stern
24   and received a series of meds without success,
25   correct?
```

1    the dumpster?

2         A.   No.

3         Q.   I'm going to show you Exhibit 6 that was

4    marked at a prior deposition, and it includes --

5    it's a declaration of Patricia E. McTaggart, but it

6    includes in Exhibit B, and Exhibit B has it in

7    photographs, and I'm going to show you specifically

8    a photograph that's dated 8/8/2011.  And for some

9    reason the page got taken off, but the page is 0044.

10   Have you ever seen that before?

11        A.   No.

12        Q.   Do you see a prom dress in there?

13        A.   I can't tell.

14        Q.   I can't either.  Did he tell you that --

15   did Mr. Bradley tell you that the kitchen cabinets

16   had been taken out of his home?

17        A.   I don't recall.

18        Q.   By he or his wife?

19        A.   I don't recall hearing that one way or the

20   other.

21        Q.   So I want you to look at page 3 of your

22   report, which we marked as D-19, sir.

23        A.   Okay.

24        Q.   And specifically I'm going to direct your

25   attention to the middle of the page.  It says,

1   "Mr. Bradley reports that in early adolescence," et

2   cetera?

3        A.   Okay.

4        Q.   Now, that paragraph, based on the

5   information that we looked at in 20 or so exhibits,

6   is at least incomplete, correct?

7        A.   Yes.

8        Q.   And in many cases, flat out wrong, right?

9        A.   That's correct.

10       Q.   But that's what you based your assessment

11  on, this incomplete, incorrect information, right?

12       A.   Yes.

13       Q.   And that information came from Mr. Bradley,

14  correct?

15       A.   That's correct.

16       Q.   And you did nothing to look at records to

17  verify the accuracy of the information he was giving

18  you other than giving him a test?

19       A.   I could not have asked for records that I

20  didn't know existed.

21       Q.   It appears though the records existed.  You

22  just never got them.

23       A.   That's correct.

24       Q.   You don't have any doubt that all these

25  records that we looked at from 2001 onward existed

Page 172

1   at the time that you did the assessment of

2   Mr. Bradley, do you?

3       A.   They would have to have.

4       Q.   I want you to look at page 5, please, under

5   "Trauma Symptom Inventory-2."

6       A.   Okay.

7       Q.   Specifically the second paragraph about the

8   scores on the validity scale.

9       A.   Yes.

10      Q.   And you reach the conclusion, "As a result,

11  his scores on the clinical scales are likely to be

12  an accurate reflection of his level of traumatized

13  symptoms."

14      A.   Trauma-related symptoms, yes.

15      Q.   And do you stand by that given all the

16  other documentary evidence that you've seen today?

17      A.   Yes.

18      Q.   Okay.  But it's fair to say that the Trauma

19  Symptom Inventory-2 did not take into account all of

20  the various prior history that could have resulted

21  in elevations of various scores, correct?

22      A.   Right, it's not -- it can't tell you when

23  something happened or what happened.

24      Q.   I'd like you to look at page 6 of your

25  report that's been marked as D-19, specifically the

Page 173

1    next to the last paragraph.

2         A.   Yes.

3         Q.   And it states, "With regard to causation,

4    all of the available information indicates that

5    Mr. Bradley's severe depression and anxiety are

6    directly related to the loss of his home and

7    possessions, and the associated break of his

8    family."  What do you mean by "causation"?

9         A.   That one had a direct influence on the

10   creation of the other.

11        Q.   The influence, did they cause it?

12        A.   Yes.  I mean, that's what I meant by

13   causality.

14        Q.   Are you confident that your conclusion on

15   causation is complete?

16        A.   No.

17        Q.   It fails to take in consideration a number

18   of episodes in his prior history, correct?

19        A.   That's correct.

20        Q.   It fails to take in consideration lots of

21   reports by psychiatrists, correct?

22        A.   That's correct.

23        Q.   It fails to take into consideration the

24   years of antidepressants that he was on, correct?

25        A.   That's correct.

1        Q.   It fails to take into consideration his

2    unilateral modification of the prescription dosages

3    for those prescription drugs, correct?

4        A.   That's correct.

5             MR. BONO:   I have no other questions.

6             MS. HALL:   I have no questions.

7             (Whereupon the deposition concluded at

8    3:14 p.m.)

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25